**ANDERSON & KARRENBERG**
Heather M. Sneddon (#9520)
Jared D. Scott (#15066)
Jason E. Greene (#13990)
50 West Broadway, #700
Salt Lake City, UT  84101-2035
Telephone:  (801) 534-1700
hsneddon@aklawfirm.com
jscott@aklawfirm.com
jgreene@aklawfirm.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (*Pro Hac Vice Pending*)
Neal J. Deckant (*Pro Hac Vice Pending*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
fklorczyk@bursor.com
ndeckant@bursor.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| MARYLEEN JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLENDTEC, INC. and K-TECH HOLDINGS, LTD.<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**(Jury Trial Demanded)**<br><br><br>**Case No. 1:19-cv-00083-PMW** |

Plaintiff Maryleen Johnson brings this action on behalf of herself and all others similarly

situated against Defendants Blendtec, Inc. and K-Tech Holdings, Ltd. (collectively, "Blendtec"

or "Defendants").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit regarding Defendants' false and misleading labeling and packaging of Blendtec-brand blenders (collectively, the "Blenders," as enumerated below).  The labeling and packaging of the Blenders are replete with false and misleading horsepower ("HP") claims, namely that the Blenders can purportedly achieve "3.0 Peak HP" and "3.8 Peak HP" (collectively, the "HP Claims").  Defendants mislead consumers into believing that the Blenders can in fact generate the claimed horsepower, even though these claims are illusory and can never be obtained in actual use.  In doing so, Defendants are able to charge a substantial price premium for their Blenders on account of these fictitious HP Claims.

2.      The true horsepower of the Blenders is only a small fraction of the HP Claims.  Blendtec has admitted to as much on their website commenting "[the Blenders] do not constantly run at [the HP Claim] level in residential kitchens."

3.      That is because in the real world, it is physically impossible for any of the Blenders to achieve a horsepower output anywhere close to Defendants' HP Claims.  According to the Electrical Rating Blendtec permanently marks on the Blenders, and pursuant to testing performed by Underwriters Laboratories ("UL"), a prestigious third-party laboratory specializing in electrical appliances with whom Blendtec collaborated prior to the sale of the Blenders, the total electrical power input possible at any instance for the "3.0 Peak HP" models is only 1560

watts and for the "3.8 Peak HP" models is only 1800 watts.[1]  If the electrical power is perfectly converted by the Blenders' motors, which it is not, the total possible output power of a Blender labeled with "3.0 Peak HP" is only about 2.09 horsepower (one horsepower equals about 745.7 watts).  This is 30.2% below the claimed "3.0 Peak HP."  The same calculation for the Blenders labeled with "3.8 Peak HP" yields only about 2.41 horsepower, or 36.5% lower than the claimed horsepower.  In fact, the standard NEMA 5-15 receptacles (*i.e.*, 3-prong wall outlets) found in American homes, and the NEMA 5-15 plugs (*i.e.*, 3-prong plugs) found on the Blender, are never rated for more than 1800 watts and 0.5 horsepower, respectively.  Thus, Defendants' HP Claims are unobtainable, under any conditions.

4.      Defendants labeled the Blenders with false and misleading horsepower ratings because such representations are highly material to consumers and serve to differentiate the Blenders from competitors' blenders.  Here, consumers relied on Defendants' horsepower claims, but only received a small fraction of the horsepower promised and expected.  Consumers, when purchasing their Blenders, relied on Defendants' HP Claims to determine the strength and processing ability of their Blenders compared to others.  This number, which a reasonable consumer assumes is correct, forms a substantial basis of her or her bargain, and in turn allows Defendants to command a price premium for the Blenders over comparable models.  The higher the horsepower number, the more likely a consumer is to purchase the Blender over another model, and the more money a consumer is willing to spend.

---

[1] The marked electrical rating is the electrical power the device draws, even in the "most severe conditions of normal use."  Even with a 15% underestimate that the UL allows, the horsepower output is significantly below the representation on the products' labeling and packaging.  *See infra.*

5.      Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers for breach of express warranty; breach of the implied warranty of merchantability; unjust enrichment; negligent misrepresentation; fraud; and violation of state consumer protection statutes, including the Utah Consumer Sales Practices Act ("UCSPA"), the Virginia Consumer Protection Act ("VCPA"), and all other applicable federal and state laws.

## THE PARTIES

6.      Plaintiff Maryleen Johnson is a citizen of Virginia, residing in Fredericksburg, Virginia.  In September 2018, Plaintiff Johnson purchased a Blendtec-brand Blender, specifically the "Blendtec Designer 650," while in Virginia from the Home Shopping Network ("HSN"), an online retailer, at http://hsn.com/.  Prior to the purchase of her Blendtec Blender, Plaintiff Johnson reviewed the product's labeling and packaging and saw that the Blender purportedly had a horsepower rating of "3.0 Peak HP."  Plaintiff Johnson relied on that labeling and packaging to choose her Blender over comparable models.  Plaintiff Johnson saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that her Blendtec Blender was capable of producing the claimed "3.0 Peak HP" during normal use and operation.  Plaintiff Johnson relied on these representations and warranties in deciding to purchase her Blendtec Blender.  Accordingly, these representations and warranties were part of the basis of the bargain, in that she would not have purchased her Blendtec Blender on the same terms, or would have purchased a competitor's blender, had she known these representations were not true.  In making her purchase, Plaintiff Johnson paid a substantial price premium due to the false and misleading HP Claims.  However, Plaintiff Johnson did not receive the benefit of her bargain because her Blendtec Blender, in fact, does not produce anywhere near 3.0

horsepower.  Plaintiff Johnson also understood that in making the sale, her retailer was acting

with the knowledge and approval of the Defendants and/or as the agent of the Defendants.

Plaintiff Johnson further understood that the purchase involved a direct transaction between

herself and Defendants, because the purchase came with Defendants' representations and

warranties that her Blendtec Blender produced 3.0 horsepower.

7.    Defendant Blendtec, Inc. is a Utah Corporation, with its headquarters in Orem,

Utah.  Blendtec, Inc. was founded and has been incorporated since 1975 as a subsidiary of

Defendant K-Tec Holdings, Ltd. (formerly K-Tec, Inc.) which is also a Utah corporation, sharing

the same headquarters in Orem, Utah (collectively, "Blendtec").  Since then Blendtec has

manufactured and sold a multitude of consumer and professional grade blenders and related

accessories, including the Blenders.  Blendtec is responsible for the advertising, marketing, trade

dress, and packaging of Blendtec Blenders.  Blendtec manufactured, marketed, and sold the

Blenders during the class period.  The planning and execution of the advertising, marketing,

labeling, packaging, manufacturing, testing, and/or corporate operations concerning the Blenders

and the HP Claims was primarily carried out at Blendtec's headquarters and facilities within

Utah.[2]

8.    The Blenders at issue include all Blendtec models that purport to have "3.0 Peak

HP" or "3.8 Peak HP:"

---

[2] According to Blendtec, the majority of Blenders' manufacturing occurs in their Utah facilities. *See*
https://www.blendtec.com/blogs/news/made-in-the-usa-part-1 [https://perma.cc/9FS4-5LA3] (accessed July 18,
2019).

A. Blenders labeled as having "3.0 Peak HP" or greater in the "Blendtec Classic Blender" Series including: "Blendtec Classic 575" with a purported "3.0 Peak HP" and "Blendtec Fit" with a purported "3.0 Peak HP;"

B. Blenders labeled as having "3.0 Peak HP" or greater in the "Blendtec Designer Blender" Series including: "Blendtec Designer 625" with a purported "3.0 Peak HP," "Blendtec Designer 650" with a purported "3.0 Peak HP," "Blendtec Designer 675" with a purported "3.0 Peak HP," and "Blendtec Designer 725" with a purported "3.8 Peak HP;"

C. Blenders labeled as having "3.0 Peak HP" or greater in the "Blendtec Refurbished Blender" Series including: "Blendtec Total Blender Certified Refurbished" with a purported "3.0 Peak HP," "Blendtec Total Blender Classic Certified Refurbished with a purported "3.0 Peak HP," "Blendtec Classic 575 Certified Refurbished" with a purported "3.0 Peak HP," "Blendtec Designer 625 Certified Refurbished" with a purported "3.0 Peak HP," and "Blendtec Designer 725 Certified Refurbished" with a purported "3.8 Peak HP;"

D. Blenders labeled as having "3.0 Peak HP" or greater in the "Blendtec Professional Blender" Series including: "Blendtec Professional 750" with a purported "3.8 Peak HP" and "Blendtec Designer 800" with a purported "3.8 Peak HP;" and

E. Blenders labeled as having "3.0 Peak HP" or greater in the "Blendtec Commercial Blender" Series including: "Blendtec Stealth 895 NBS®" with a purported "3.8 Peak HP," "Blendtec Stealth 885" with a purported "3.8 Peak HP," "Blendtec Connoisseur 825™" with a purported "3.8 Peak HP," "Blendtec Connoisseur 825

Spacesaver®" with a purported "3.8 Peak HP," "EZ® 600" with a purported "3.0

Peak HP," and "Blendtec Chef 600™" with a purported "3.0 Peak HP."

9.      Plaintiff reserves the right to amend this Complaint to add different or additional

defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and

deceptive conduct alleged herein.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A)

because this case is a class action where the aggregate claims of all members of the proposed

class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members

of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of

a state different from Defendants.

11.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because a substantial part of the events, omissions, and acts giving rise to the claims herein

occurred in this District.  Also, Defendants are incorporated and headquartered in this District.

Moreover, Defendants distributed, advertised, and sold the Blenders to class members, which is

the subject of the present complaint, in this District.

## FACTS COMMON TO ALL CLAIMS

### A.  The Blenders Are Uniformly Labeled And Marketed As Having "3.0 Peak HP" Or "3.8 Peak HP"

12.     The Blenders are commonly and uniformly labeled, packaged, marketed, and

advertised with representations of horsepower ratings of "3.0 Peak HP" and "3.8 Peak HP."

13.     At HSN, and other online retailers, the HP Claims are uniformly and prominently featured for the Blenders.  For instance, HSN's website lists a HP Claim of "3.0 peak horsepower" as the first "Feature" for the "Blendtec Designer 650:"[3]

## Features

### 3.0 peak horsepower motor

- Plenty of power for most home blending jobs
- Allows you to break down heavy material such as seeds, nuts, skins and ice with ease
- No need to worry about overloading it with too many ingredients

14.     Similarly, brick and mortar retail locations uniformly and prominently feature the HP Claims, as seen below in retail labeling at a Costco in the United States:[4]



15.     The Blendtec website (blendtec.com) uniformly and prominently features the HP Claims as the first feature under the specification tab for all Blenders.  For example, under the

---

[3] https://www.hsn.com/products/blendtec-designer-650-blender-bundle-wtwister-jar-and-8/9082236 [https://perma.cc/K98A-4CGY] (accessed 7/18/2019).
[4] https://www.youtube.com/watch?v=tHSvQrJZl8c (published 1/23/2019 and accessed 7/18/2019).

"Specs" tab for the "Blendtec Designer 650," the HP Claim "3.0 peak horsepower" is advertised:[5]

## SPECS

- 3.0 peak horsepower
- Fully sealed
- easy clean capacitive touchscreen interface
- Preprogrammed cycles: Sauces/Batters, Ice Crush/Margarita, Smoothie, Ice Cream, Whole Juice, Hot Soup & Fondues
- 8 manual speeds + Pulse
- Illuminated LCD timer displays remaining time

16.     As of July 2019, Blendtec uniformly and prominently advertises a HP Claim of "3.0 horsepower" or "3.8 horsepower" for all of the Blenders on their website and marketing materials.  For example, in some of Blendtec's comparison charts on their website, the HP Claim is the first feature compared:[6]

---

[5] https://www.blendtec.com/collections/designer-blenders/products/designer-650?variant= 1434538442772 [https://perma.cc/Z86G-K23R] (accessed 7/18/2019).
[6] https://www.blendtec.com/pages/compare-blenders [https://perma.cc/3FQN-9P28] (accessed 7/18/2019).

## Products



| | Blendtec Fit | Classic 575 | Designer 675 | Designer 650 | Designer 625 |
|---|---|---|---|---|---|
| | Black | Black / FourSide | Black | Black | Black |
| HORSEPOWER | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| CYCLES | 2 | 4 | 5 | 6 | 4 |
| SPEEDS | High Pulse & Low Pulse | 5 + Pulse | 8 + Pulse | 8 + Pulse | 6 + Pulse |
| CONTROL | Push Button | Push Button | Touchscreen | Touchscreen | Touchscreen |
| FINISH | Molded | Molded | Molded Plastic | Molded Plastic | Molded |
| WARRANTY | 2 Year | 8 Year | 8 Year | 8 Year | 8 Year |
| COLORS | ■ Black | ■ Black | ■ Black | ■ Black | ■ Black |
| | | ■ Orchid | ■ Pomegranate | ■ Pomegranate | ☐ Polar White |
| | | ■ Slate Grey | | | ■ Pomegranate |
| | | ■ Poppy | | | ■ Slate Grey |
| | | ■ Caribbean Blue | | | |
| | | ☐ Polar White | | | |
| | **$299.95** | **$379.95** | **$449.95** | **$449.95** | **$499.95** |
| | SEE DETAILS | SEE DETAILS | SEE DETAILS | SEE DETAILS | SEE DETAILS |

| | Designer 725 | Professional 750 | Professional 800 |
|---|---|---|---|
| | Stainless/Black | Black | Black |
| HORSEPOWER | 3.8 | 3.0 | 3.8 |
| CYCLES | 6 | 6 | 6 |
| SPEEDS | 100 + Pulse | 10 + Pulse | 11 + Pulse |
| CONTROL | Touchscreen | Push Button | Touchscreen |
| FINISH | Die-cast | Molded | Molded |
| WARRANTY | 8 Year | 8 Year | 10 Year |
| COLORS | ■ Stainless/Black | ■ Black | ■ Black |
| | ■ Gunmetal | | |
| | ■ Stainless/White | | |
| | **$599.95** | **$749.95** | **$799.95** |
| | SEE DETAILS | SEE DETAILS | SEE DETAILS |

10

17.    Blendtec also touts the HP Claims in media announcements on their website, such as when the "Blendtec Designer 725" won the "Best Blender of 2019" award from "Gadget Review."  For example, in one advertisement, Blendtec predominately touts the "3.8 peak horsepower" claim:[7]

## About Blendtec's Designer 725 Blender

This blender is one you won't only use once a month. The Designer 725 is incredibly powerful, easy to clean, and versatile. It has many uses, and looks attractive on the kitchen counter. As part of Blendtec's Designer series, the 725 blender comes in three sleek, modern color options that upgrade the look of any kitchen.

[h3] Specs

3.8 peak horsepower motor
This powerful motor can chop through even the toughest ingredients, turning ice into snow, almonds into flour, and kale into a beautiful liquid.

18.    Additionally, on the labeling and packaging of the Blenders, a HP Claim of "3.0 peak horsepower" or "3.8 peak horsepower" is prominently featured on the exterior of the box. For example, the "Blendtec Designer 650," the same model that Plaintiff Johnson purchased, represents that the product has "3.0 Peak HP."

19.    However, these HP Claims are untrue and misleading, as the actual operating power and functionality of the Blenders, under any condition, is only a small fraction of these representations:

| HP Claim | Actual Max HP | % Difference | Electrical Rating, in Amps (at 120V) | Max Watts (*i.e.*, Amps times 120V) |
|---|---|---|---|---|
| 3.0 | **2.09** | **-30.2%** | 13 amps | 1560 watts |
| 3.8 | **2.41** | **-36.5%** | 15 amps | 1800 watts |

---

[7] https://www.blendtec.com/blogs/news/best-blender-2019?_pos=7&_sid=0f9fce854&_ss=r [https://perma.cc/RP4E-GK8C] (accessed 7/18/2019); *see also* https://www.gadgetreview. com/best-blenders [https://perma.cc/6PB3-DYT9] ("[the Blender] boasts 3.8hp").

**B.** **Blendtec Knows That The HP Claims Are Untrue, Yet Still Includes The HP Claims In Marketing, Advertising, Labeling, And Packaging**

20.     On May 31, 2019, Blendtec admitted in a comment on their own website that the Blenders "do not constantly run at [the HP Claim] level in residential kitchens:"[8]

Dear Monica,

Thank you for your email. The blenders themselves have not changed. However, because of an increasingly litigious environment, particularly in California, Blendtec, along with other companies in the US, have been forced in recent years to take a very conservative approach to product claims. For example, although our blenders are and always have been made at our facilities in the United States, because we use a few minor components from overseas, we are at risk of a lawsuit if we claim to be "Made in the USA." Similarly, although our blenders are certified to achieve 3 peak horsepower in laboratory testing, because they don't constantly run at that level in residential kitchens, we risk a lawsuit under the current state of US law if we make a peak horsepower claim.

I hope that answers your questions.

**Blendtec** on **May 31, 2019**

Nonetheless, Blendtec continues to include the HP Claims in their marketing, advertising, labeling, and packaging.

**C.** **Horsepower Is A Commonly And Uniformly Understood And Defined Measure Of Power**

21.     A horsepower is a common measure of the work power of a device.  Both normal consumers and technical experts understand and use horsepower as a standard unit of measurement for determining the work power, or power output, of a particular device.  The definition of 1 horsepower converted to electric terms is 745.7 watts.  For example, the equivalent of 3.0 horsepower is about 2237 watts, and 3.8 horsepower is 2834 watts.  For an electrical device to output a particular work power, the device must draw, or input, an equivalent power from an electrical source such as a wall outlet or circuit.[9]

---

[8] https://www.blendtec.com/blogs/news/made-in-the-usa-part-1 [https://perma.cc/9FS4-5LA3] (accessed July 18, 2019).

[9] Real world devices and circuitry are inefficient, and the work power for a device will always be less than the electric power input due to losses.  *See infra*.  That said, the calculations in this complaint are highly conservative and over-estimate available power.

**D.  Household Circuits In the United States Are Limited To A Particular Total Power Output In Watts**

22.     Similar to a narrow pipe that limits the flow of water, wiring size limits the amount of electricity that can flow before the wire heats up and potentially catches fire.  As such, in the United States, residential and commercial wiring is strictly and uniformly regulated. Residential circuits are normally limited to 15 amps in 120V circuits which means that the total wattage (power) available from a standard wall outlet is 1800 watts (*i.e.*, 120V times 15 amps).[10] If a device, or a short circuit, tries to pull more power than the rating, a breaker (fuse) will cut power to the entire circuit.  Thus, assuming perfect efficiency, which is not possible, any claim over 2.41 horsepower (1800 watts divided by 745.7 watts/horsepower) is physically impossible to attain.

23.     These power ratings are for the circuit as a whole, so in ordinary use, there may be other devices connected and using power, which would further reduce the amount of power for the Blender before blowing the breaker (fuse).

24.     In the interest of simplicity, and as noted further in the Complaint, the power limit of 1800 watts from a household circuit is grossly exaggerated from actual use because it does not consider efficiency losses in the wiring, motor, or other sources which would reduce the wattage capabilities of the device considerably.[11]  As such, the calculations in this Complaint are highly

---

[10] Some circuits in the United States offer 20 amps, which would be equivalent to 2400 watts of power.  These circuits are normally for use by permanent high-draw devices such as refrigerators and have a different plug and receptacle (NEMA 5-20), which is not found on the Blenders.  In any case, the power specifications for the Blenders, even ones with the highest claims, do not exceed 15 amps or 1800 watts by Blendtec's own ratings in use on the labeling and packaging.

[11] Electric motors are commonly between 50-90% efficient in converting electric power to work power (horsepower), depending on the load, type, quality, design, and construction of the motor, wiring, circuitry, and device.

conservative and over-estimate available power.  Even so, Defendants' Blenders do not achieve

the peak horsepower claimed and in fact only deliver a small fraction of the claimed amount.

### E.   Household Receptacles In The United States Are Limited To A Particular Total Power Output In Watts

25.   The vast majority of household receptacles (outlets) in the United States are

standardized NEMA 5-15, or equivalent, as defined by National Electrical Manufacturers

Association ("NEMA").[12]  NEMA 5-15 plugs and receptacles are limited to 15 amps at 120V,

and thus 1800 watts.[13]  All of the Blenders are sold with NEMA 5-15 plugs.

26.   Additionally, manufacturers, along with NEMA and the American National

Standards Institute ("ANSI"),[14] routinely publish maximum horsepower ratings for standardized

receptacles.  Not a single 15 amp receptacle has a rating above 0.5 horsepower.

27.   It is unsafe for a device to use more power than the receptacle it is designed for.

As such, manufacturers, including Blendtec, could not design a blender that would draw more

power than a household outlet is designed to provide.

### F.   Blendtec States A Contradictory "Electrical Rating" Which Shows That The Advertised Horsepower Cannot Be True

28.   In Blendtec brochures, websites, user manuals, and on the appliance itself, an

Electric Rating is stated.[15]  For example on the "Blendtec Designer 650," the same Blender

---

[12] NEMA (National Electrical Manufacturers Association) is the largest trade association of electrical equipment manufacturers in the United States and sets standards for electrical equipment throughout the United States.

[13] For 20 amp circuits NEMA 5-20 plugs and receptacles, or equivalent, are used.  However, Blendtec's own power ratings for the Blenders do not exceed 15 amps at 120V or 1800 watts and the Blenders have NEMA 5-15 plugs.

[14] ANSI (American National Standards Institute) is one of the largest standardization organizations in the world with over 125,000 company members and 3.5 million members.

[15] This rating is also verified by the UL and other third-party testing organizations and is permanently marked on all the Blenders.  *See infra*.

Plaintiff Johnson purchased, an Electrical Rating of "1560 WATTS" is permanently labeled on

the Blender's base:



29.     The same or similar ratings are found listed under specifications and statements

on Blendtec and retail websites:[16]

## Specifications 

| | |
|---|---|
| Color Choices: | Black, Orchid, Pomegranate or Slate Gray |
| Model #: | Designer 650 |
| Measurements: | Approx. 7"L x 9-1/4"W x 15-1/2"H |
| Volume Capacity: | Twister Jar - 37 oz. with blending capacity of 16 oz.; WildSide+ Jar - 90 oz. with blending capacity of 36 oz. |
| Power Source: | Plugs into a standard household outlet |
| Wattage: | 1560 watts |

30.     Blendtec themselves advertise in a comparison of their "Designer" and

"Signature" Series that the Blenders have "powerful 1560 watt motor[s] (3 pk hp)."[17]

31.     An Electrical Rating is found on every one of the Blenders.  Thus, according to

Blendtec themselves, Blenders with HP Claims of "3.0 Peak HP" are uniformly rated at 13 amps

at 120V or 1560 watts.  This is significantly less than the 2237 watts a true 3.0 horsepower motor

---

[16] https://www.hsn.com/products/blendtec-designer-650-blender-bundle-wtwister-jar-and-8/9082236
[https://perma.cc/K98A-4CGY] (accessed 7/18/2019).
[17] https://www.blendtec.com/blogs/news/signature-series-vs-designer-series?_pos=4&_sid=ab3254fb9&_ss=r
[https://perma.cc/NVA3-LMPJ] (accessed 7/19/2019).

requires.  Blenders with HP Claims of "3.8 Peak HP" are uniformly rated at 15 amps at 120V or 1800 watts.  This is significantly less than the 2834 watts a true 3.8 horsepower motor requires.

32.    The above calculation and comparison can be easily calculated for every model Blender, with one, uniform answer: the Blenders do not, and cannot, produce the claimed horsepower.

### G.  UL Is A Highly Reputable Safety Certification Organization, And UL Certification Is All But Required To Sell Electrical Products In The United States

33.    Federal laws and governmental regulatory agencies such as OSHA, state and local laws, common distribution and purchasing contracts, and potential safeguards against tort liability, all but require product manufacturers and distributors, such as Blendtec, to test their devices with a National Registered Testing Laboratory ("NRTL") for safety.  The most common and ubiquitous NRTL is UL LLC (formally known as Underwriters Laboratories) ("UL"), a non-profit and federally approved NRTL.[18]

34.    UL, as an independent third-party organization, tests millions of products a year in almost every industrial and consumer product category for safety.  UL creates and sets standards for particular components, such as wiring, as well as "UL Standard[s]" for entire product categories.  A UL Standard is a standardized testing regime formulated for a particular type of similar products to ensure uniform safety for all devices.  When a device is sent to the UL, and it passes the rigorous tests, the device becomes "UL Listed."  The company can then put the UL mark on its product to show the certification.  As well, the company can sell the device in

---

[18] Blendtec also stamps and certifies their blenders with Technischer Überwachungsverein ("TUV") and ETL SEMKO (Formally Electrical Testing Laboratory and a division of Intertek Group plc) ("ETL"), both similarly reputable and ubiquitous registered NRTLs and third-party certification agencies.  These certifications, of which the Blenders are also tested and certified by will have similar, if not the same, standards as the UL.

jurisdictions requiring the certification (nearly the entire US market has some type of schema requiring a NRTL, such as UL, certification).

35.     One such UL Standard is "UL 982 Standard for Motor-Operated Household Food Preparing Machines."  According to UL listings and the product packaging and labeling, all of the models in every series of the Blenders are uniformly UL Listed and marked, and thus tested under UL 982.  For instance, the Blender Plaintiff Johnson purchased, the "Blendtec Designer 650," includes the below labeling on the box:



Conforms to ANSI/UL Std. 982 and Cert. to CAN/CSA Std. C22.2#195.
Conforme aux normes ANSI/UL Std. 982 et CAN/CSA Std. C22.2#195.
Conforme a ANSI/UL Std. 982 y certificado a CAN/CSA Std. C22.2#195.

**H.   "UL 982 Standard For Motor-Operated Household Food Preparing Machines" Has Particular Safety Tests That Limit The Electrical Rating**

36.     UL 982 tests a Blender being certified in numerous testing conditions that mimic the most extreme real-world operating scenarios.  For instance, UL 982 34.1.11 defines the "[m]aximum normal load … [as the] load which approximates as closely as possible <u>the most severe conditions of normal use</u>" (underline added).

37.     UL 928 33 defines an "Input Test" which dictates an electrical rating where "the measured input in watts or amperes … shall not exceed the marked rating by an amount greater than the deviation shown in Table 33.1 when the appliance is operated under a condition of maximum normal load as described in [aforementioned] 34.1.1 …."

**Table 33.1**
**Input test deviations**

| Rated input, watts | Deviation (+/-) | Rated input, amperes | Deviation (+/-) |
|---|---|---|---|
| Up to and including 33.3 | 10 W | Up to and including 0.29 | 0.09 A |
| Over 33.3 up to and including 150 | 30 percent | Over 0.29 up to and including 1.3 | 30 percent |
| Over 150 up to and including 300 | 45 W | Over 1.3 up to and including 2.6 | 0.4 A |
| Over 300 | 15 percent | Over 2.6 | 15 percent |

38.     The Blenders, which have a "Rated Input" of over 300 watts, are then allowed to have a deviation (+/-) of "15%."  This means the "input watts" (power) of the Blenders cannot exceed 15% more than the value that Blendtec permanently marks the Blenders with.  Thus, the highest power the device can ever draw, even in the "most severe conditions of normal use" has been tested and confirmed by the UL to be not more than 15% of the Electrical Rating Blendtec permanently stamps all of its products with, as required by UL 928 68.1.[19]  This means that because the Blenders with "3.0 Peak HP" are marked with a maximum rating of 1560 watts, they cannot pull more than 1784 watts, much less than the 2237 watts a true 3.0 horsepower motor requires.  Similarly, Blenders marked as "3.8 Peak HP" and with a maximum rating of 1800 watts, cannot pull more than 2070 watts, much less than the 2834 watts a true 3.8 horsepower motor requires.

---

[19] The starting current for an electric motor is also one of the highest draw scenarios.  UL 982 32, in short, requires that "[a]n appliance shall be capable of starting and operating on a circuit protected by an intended (non-time-delay) fuse having a current rating corresponding to that of the branch circuit to which the appliance should be connected." Because the Blenders are all designed and marked to operate on 120V at 15 amps or less, and are not marked for the use of a timed-delay fuse via UL 982 32.1.2, even at start, the Blenders cannot pull more 1800 watts (i.e., 120V times 15 amps), which is less than the 1865 watts even a 2.5 horsepower motor requires.

**I.    Defendants Intentionally Mislabeled The Blenders With False And Misleading "Peak HP" Claims**

39.    Via the comments made by Blendtec all but admitting that the Blenders do not output the claimed horsepower, by permanently marking the Blenders with the UL-verified electrical rating, and by publishing the electrical rating, Blendtec knew that the HP Claims were false and misleading, yet still advertised, labeled, and packaged the Blenders with the exaggerated horsepower claims.

40.    The Blenders do not, and will never be able to, output the claimed horsepower and meet the power requirements required for the Blenders' advertised horsepower, as is demonstrated by: (1) Blendtec's own admission; (2) the inability for household circuits to provide the necessary power required to meet the HP Claims; (3) the inability for household receptacles to provide the necessary power required to meet the HP Claims; (4) Blendtec's own electric rating not meeting the power requirements necessary for the HP Claims; and (5) UL testing, certification, and marking demonstrating the maximum operating power of the device, under any conditions, does not meet the necessary power required to meet the HP Claims.

41.    Simply put, Blendtec's horsepower claims are a farce.  It is physically impossible for any consumer to experience and use the claimed horsepower during use, under any conditions.  The true horsepower rating is only a small fraction of what is depicted on Defendants' labeling and packaging.

**CLASS ACTION ALLEGATIONS**

42.    Pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a class defined as all persons in the United States who purchased a Blendtec Blender with a "3.0 Peak HP" or "3.8

Peak HP" claim (the "Class"). Excluded from the Class are persons who made such purchase for the purpose of resale.

43.     Plaintiff also seeks to represent a subclass of all Class members who purchased the Blenders in Virginia (the "Virginia Subclass").

44.     Members of the Class and Virginia Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Virginia Subclass number in the tens or hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

45.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: whether the HP Claims are false or misleading; whether Defendants warranted the horsepower claim on the packaging and labeling; whether Defendants breached these warranties; and whether Defendants committed statutory and common law fraud by doing so.

46.     The claims of the named Plaintiff are typical of the claims of the Class and Virginia Subclass in that the named Plaintiff purchased a Blendtec Blender in reliance on the representations and warranties described above, and suffered a loss as a result of those purchases.

47.     Plaintiff is an adequate representative of the Class and Virginia Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to

prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

48.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class and Virginia Subclass members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### (Breach Of Express Warranty)

49.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

50.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendants.

51.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, expressly warranted in the HP Claims that the Blenders outputted a claimed "3.0 Peak HP" or "3.8 Peak HP."

52.     In fact, the Blenders do not, and cannot, output the horsepower in the HP Claims.

53.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiff and the Class have been injured and harmed because:  (a) they would not have purchased the Blenders on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Blenders due to the HP Claims; and (c) the Blenders do not have the characteristics,  uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

## COUNT II
### (Breach Of The Implied Warranty Of Merchantability)

54.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

55.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendants.

56.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, affixed HP Claims to each Blender and impliedly warranted that the Blenders outputted a "3.0 Peak HP" or "3.8 Peak HP."

57.     Defendants breached the warranty implied in the contract for the sale of the Blenders because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the Blenders do not, and in fact, could never output the horsepower claimed during use by Class members as advertised.  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

58.     Plaintiff and Class members purchased the Blenders in reliance upon Defendants' skill and judgment and the implied warranties.

59.     The Blenders were not altered by Plaintiff and Class members.

60.     The Blenders were defective when they left the exclusive control of Defendants.

61.     Defendants knew that the Blenders would be purchased and used without additional testing by Plaintiff and Class members.

62.     The Blenders were defectively designed and unfit for their intended purpose, and Plaintiff and Class members did not receive the goods as warranted.

63.     As a direct and proximate cause of Defendants' breach of the implied warranty the Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Blenders on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Blenders due to the HP Claims; and (c) the Blenders do not have the characteristics,  uses, benefits, or quantities as promised in that the claimed HP can never be achieved in actual use.

## COUNT III
### (Unjust Enrichment)

64.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

65.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendants.

66.     Plaintiff and Class members conferred benefits on Defendants by purchasing the Blenders.

67.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Blenders.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented in the HP Claims that the Blenders outputted a claimed "3.0 Peak HP" or "3.8 Peak HP."  These misrepresentations caused injuries to Plaintiff and Class members because they would not have purchased the Blenders at all, or on the same terms, if the true facts were known.

68.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class members for its unjust enrichment, as ordered by the Court.

## COUNT IV
### (Negligent Misrepresentation)

69.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

70.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendants.

71.     As discussed above, Defendants misrepresented that the Blenders outputted a claimed "3.0 Peak HP" or "3.8 Peak HP" by virtue of the HP Claims.  Defendants had a duty to disclose the proper horsepower rating rather than misrepresented information.

72.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

73.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about the Blenders, namely their true horsepower.

74.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Blenders.

75.     Plaintiff and Class members would not have purchased the Blenders if the true facts about the HP Claims had been known.

76.     The negligent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

### COUNT V
### (Fraud)

77.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78.     Plaintiff brings this claim individually and on behalf of the members of the Class and Virginia Subclass against Defendants.

79.     As discussed above, Defendants provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Blenders, including but not limited to the fact that they do not, and cannot, output the "3.0 Peak HP" or "3.8 Peak HP" claimed in the HP Claims.  These misrepresentations and omissions were made with knowledge of their falsehood.

80.     The misrepresentations and omissions made by Defendants, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the Blenders.

81.     The fraudulent actions of Defendants caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VI**
**(Violation of the Utah Consumer Sales Practices Act,**
**Utah Code §§ 13-11-1, *et seq.*)**

82.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

83.    Plaintiff brings this claim individually and on behalf of the proposed Class against Defendants.

84.    The Utah Consumer Sales Practices Act makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction."

85.    The action is able to be maintained as a class action under UCSPA because the action meets the requirements stated under §§ 13-11-20.  Application of UCSPA to all Class members throughout the country, regardless of their state or residence, is appropriate because, *inter alia*:

a)   Defendants designed and manufactured the Blenders in Utah;

b)   Defendants' nationwide sales operations are controlled, directed and originate from Utah;

c)   Defendants' marketing, executive, and manufacturing operations, including the decisions regarding how to advertise, promote, and sell the Blenders, are made in Utah, and internal marketing personnel and external marketing consultants all are based there;

d)   Defendants' telephone sales force, customer service, Internet website, advertising operations, and distribution are controlled, directed, and originate in Utah;

e)   Defendants' principal place of business is in Utah;

    f)   Defendants are incorporated in Utah;

    g)   All significant employees of Defendants are based in Utah;

    h)   Internet sales of the Blenders are placed, fulfilled, and carried out in Utah; and

    i)   The facts and circumstances of this case include such numerous contacts with the State of Utah as to create a state interest in applying Utah's consumer laws to Defendants, making application of Utah law to the entire Class appropriate.

86.    Plaintiff and the Class are "persons" under the Utah Consumer Sales Practices Act, Utah Code § 13-11-3(5).

87.    Defendants are "suppliers" of the Blenders within the meaning of Utah Code § 13-11-3(6).

88.    The sale of the Blenders to Plaintiff and the Class is a "consumer transaction" within the meaning of Utah Code § 13-11-3(2).

89.    Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has … performance characteristics, … if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, grade, style, or model, if it is not." Utah Code § 13-11-4.

90.    Per Utah Code § 13-11-5 Blendtec committed an "unconscionable act or practice … in connection with a consumer transaction" by virtue of the false and misleading HP Claims.

91.    Per Utah Code § 13-11-19(4)(a) claims for damages must be "caused by an act or practice specified as violating this chapter by a rule adopted by the enforcing authority under Subsection 13-11-8(2) before the consumer transaction on which the action is based."  Here the

act is specified under Utah Administrative Code R152-11-3 entitled "Bait Advertising/

Unavailability of Goods:"

> B. It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to offer to sell consumer commodities when the offer is not a bona fide effort to sell the advertised consumer commodities.  An offer is not bona fide if:

> (1) A supplier uses a statement or illustration in any advertisement which would create in the mind of a reasonable consumer a false impression of the grade, quality, quantity, make, value, model, year, size, color, usability, or origin of the consumer commodities offered or which otherwise misrepresents the consumer commodities in such a manner that, on subsequent disclosure or discovery of the true facts, the consumer is diverted from the advertised consumer commodities to other consumer commodities. An offer is not bona fide, even though the true facts are made known to the consumer before he views the advertised consumer commodities, if the first contact or interview is secured by deception.

UAC R152-11-3.

92.     Blendtec caused damages by a deceptive act or practice in connection with a

consumer transaction by selling the Blenders without a bona fide effort to sell the advertised

consumer commodity when it sold the Blenders with false HP Claims.  Blendtec used the HP

Claims to create, in the mind of a reasonable consumer, a false impression of the particular,

quality, value, and usability of the consumer commodities offered.  As well, the HP Claims

otherwise misrepresented the consumer commodities and stopped the Plaintiff and the Class

from purchasing competitors' blenders, if they had known the truth.

93.     The Plaintiff and the Class did not know before purchase of the nature of the false

HP Claims, and at the least the first contact was secured by the deception of the HP Claims.

94.     By making false representations about the Blenders' horsepower, Defendants misrepresented the "grade," "quality," and "usability" of the blenders.

95.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff and Class members suffered damages and ascertainable losses, in amounts to be determined at trial, by paying more for Blenders than they would have or by purchasing Blendtec Blenders when they would not have if the true facts were known.

96.     Plaintiff and the Class suffered an actual loss as a result of the purchase in that the value of the Blenders purchased, with a lower horsepower than the false HP Claims, is substantially lower than the value of a Blender if the HP Claims were true.

97.     As a result of Defendants' violations, Plaintiff and members of the Class have suffered damages because: (a) they would not have purchased Blendtec Blenders on the same terms if they knew that the HP Claims were not true; (b) they paid a price premium for the Blenders due to Defendants' promises that Blenders outputted a particular horsepower; and (c) Blendtec Blenders do not have the characteristics, uses, qualities, benefits, or quantities as promised, namely the horsepower promised by the HP Claims.

98.     As a result of Defendants' violation of UCSPA, Plaintiff, on behalf of herself and the Class, seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

99.     In addition, Blendtec has been provided proper pre-suit notice of this Complaint.

## COUNT VII
### (Violation of the Virginia Consumer Protection Act, §§ 59.1-200, *et seq.*)

100.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

101.    Plaintiff brings this claim individually and on behalf of the proposed Virginia Subclass against Defendants.

102.    Blendtec is a "supplier" as defined by VCPA § 59.1-198, in that Blendtec is a seller, lessor, licensor, or professional who "advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor or licensor who advertises and sells, leases, or licenses good or services to be resold … in consumer transactions."

103.    The sale of the Blenders to the Plaintiff and the Virginia Subclass constitute "consumer transaction[s]" as defined by VCPA § 59.1-198, in that the Blenders were "advertised, sold or offered for sale to the Plaintiff, to be used primarily for personal, family or household purposes."

104.    The subject transaction is regulated by the VCPA.

105.    VCPA § 59.1-200(14) provides that it is unlawful for a supplier to use "any other deception, fraud, false pretense, false promise, or misrepresentation" in connection with a consumer transaction.

106.    Per VCPA § 59.1-200(5) Blendtec "misrepresent[ed] that goods or services had certain quantities, characteristics, ingredients, uses, or benefits" by advertising the HP Claims when Blendtec knew the HP Claims were false.

107.    Per VCPA § 59.1-200(6) Blendtec "misrepresent[ed] that goods or services are of a particular standard, quality, grade, style, or model" by advertising the HP Claims when Blendtec knew the HP Claims were false.

108.    Per VCPA § 59.1-200(8) Blendtec "advertised goods or services with intent not to sell them as advertised" by selling the Blenders while advertising a HP Claim and not selling the Blenders with the horsepower claimed.

109.    Per VCPA § 59.1-200(14) Blendtec used "deception, fraud, false pretense, false promise, [and] misrepresentation in connection with a consumer transaction" by deceiving Plaintiff and the Virginia Subclass with inaccurate HP Claims when Blendtec knew that the HP Claims were false.  As such, Blendtec's actions were willful and intentional and induced the purchases by Plaintiff and the Virginia Subclass.

110.    Plaintiff and the Virginia Subclass relied on the HP Claims and would not have purchased the Blenders had they known the true horsepower output, or at least would not have purchased under the same terms.  Plaintiff and the Virginia subclass would have purchased, or were diverted from, another competitor's blender because of the HP Claims.

111.    Plaintiff and the Virginia Subclass relied upon these representations, and purchased the Blenders based on the representations that the Blenders had a particular horsepower as stated in the HP Claims.

112.    Plaintiff and the Virginia subclass suffered an actual loss as a result of the purchase in that the value of the Blenders purchased, with a lower horsepower than the false HP Claims, is substantially lower than the value of the Blenders if the HP Claims were true.

113.    As a result of Defendants' violations, Plaintiff and members of the Virginia Subclass have suffered damages because: (a) they would not have purchased Blendtec Blenders on the same terms if they knew that the Blenders did not output the HP Claimed; (b) they paid a price premium for the Blenders due to Defendants' promises that Blenders outputted a particular horsepower; and (c) Blendtec Blenders do not have the characteristics, uses, qualities, benefits, or quantities as promised.

114.    Because Plaintiff suffered a loss as a result of Defendants' violation of the VCPA, Plaintiff and the Virginia Subclass are entitled to recover all actual damages, including but not limited to, (1) the difference in the value of the Blenders as sold and blenders with the actual HP Claims; (2) the entire amount of the sales transaction, and all other actual damages proven at trial times three, plus attorneys' fees and the cost of bringing this action.

115.    On behalf of herself and the Virginia Subclass, Plaintiff Johnson seeks damages and/or rescission, equitable and/or injunctive relief, and also seeks equitable and declaratory relief, together with a reasonable counsel or attorneys' fees, and such other relief as the Court may deem necessary or appropriate to remedy these violations.

116.    Specifically, Plaintiff seeks to recover, on behalf of herself and other members of the Virginia Subclass, her actual damages or $500, whichever is greater, as well as her reasonable attorneys' fees and court costs.  Since Defendants' violation of the VCPA was willful, Plaintiff also seeks to recover, on behalf of herself and other members of the Virginia Subclass, three times her actual damages or $1,000, whichever is greater, as well as her attorneys' fees and court costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendants, as follows:

a.   For an order certifying the nationwide Class and the Virginia Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as a representative of the Class and Virginia Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Virginia Subclass members;

b.   For an order declaring the Defendants' conduct violates the statutes referenced herein;

c.   For an order finding in favor of Plaintiff, the nationwide Class, and the Virginia Subclass on all counts asserted herein;

d.   For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an order awarding Plaintiff, the Class, and Virginia Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  August 1, 2019

Respectfully submitted,

**ANDERSON & KARRENBERG, P.C.**

By:_____ */s/ Jared D. Scott*_____

Heather M. Sneddon
Jared D. Scott
Jason E. Greene
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 534-1700
Facsimile:  (801) 364-7967
E-Mail:  hsneddon@aklawfirm.com
          jscott@aklawfirm.com
          jgreene@aklawfirm.com


**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III*
Neal J. Deckant*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  fklorczyk@bursor.com
          ndeckant@bursor.com
*Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff*